IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NICHOLAS S.[1],                                        No. 3:17-cv-01268-HZ

                    Plaintiff,

          v.

NANCY A. BERRYHILL, Acting                            OPINION & ORDER
Commissioner of Social Security,

                    Defendant.


Merrill Schneider
SCHNEIDER KERR & ROBICHAUX
P.O. Box 14490
Portland, Oregon 97293

          Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

1 - OPINION & ORDER

Renata Gowie
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Jordan D. Goddard
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S/ 221A
Seattle, Washington 98104-7075

     Attorney for Defendant

HERNANDEZ, District Judge:

Plaintiff Nicholas S. brings this action seeking judicial review of the Commissioner's final decision to deny supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I affirm the Commissioner's decision.

## PROCEDURAL BACKGROUND

Plaintiff applied for SSI on October 24, 2013, initially alleging an onset date of January 20, 2002, but later amending that date to September 26, 2013. Tr. 165-70, 20. His application was denied initially and on reconsideration. Tr. 77-90, 108-11 (Initial); 91-103, 113-15 (Recon.). On April 7, 2016, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 43-76. On May 23, 2016, the ALJ found Plaintiff not disabled. Tr. 17-42. The Appeals Council denied review. Tr. 1-5.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on obesity, knee problems, back pain, panic attacks, anxiety, depression, leg and feet pain and numbness, bilateral carpal tunnel syndrome,

hypertension, and low heart rate. Tr. 190. At the time of the hearing, he was thirty-six years old.

Tr. 50. He did not complete high school and has no past relevant work experience. Tr. 368.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his September 26, 2013 application date. Tr. 22. Next, at step two, the ALJ determined that Plaintiff has severe impairments of obesity, affective disorder, anxiety disorder, intellectual disability, and autism spectrum disorder. *Id.* However, at step three, the ALJ found that Plaintiff's impairments did not meet or equal, either singly or in combination, a listed impairment. Tr. 24-27.

At step four, the ALJ concluded that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), except he can frequently climb ramps and stairs, stoop, kneel, and crouch. Tr. 28. He can occasionally climb ladders, ropes, or scaffolds, and crawl. *Id.* He is limited to performing simple, routine, and repetitive tasks, and to simple work-related decisions. *Id.* He is also limited to occasional interaction with supervisors and coworkers and no contact with the public. *Id.* Because Plaintiff has no past relevant work, the ALJ went immediately to

step five.  Tr. 36.  With this RFC, the ALJ determined that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as agricultural produce sorter, small products assembler, and electronics worker.  Tr. 37.  Thus, the ALJ determined that Plaintiff is not disabled.  *Id.*

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision.  *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."  *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred by improperly finding his subjective testimony not credible, by improperly rejecting the opinion of an examining psychologist, and by improperly determining that he did not meet a listed impairment at step three.

/ / /

I. Plaintiff's Credibility

The ALJ is responsible for determining credibility. *Vasquez*, 572 F.3d at 591. Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility: First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain. *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors

in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation,

such as the claimant's reputation for lying, prior inconsistent statements concerning the

symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or

inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*;

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of
> credibility evaluation. For instance, the ALJ may consider inconsistencies either
> in the claimant's testimony or between the testimony and the claimant's conduct,
> unexplained or inadequately explained failure to seek treatment or to follow a
> prescribed course of treatment, and whether the claimant engages in daily
> activities inconsistent with the alleged symptoms[.] While a claimant need not
> vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit
> a claimant's testimony when the claimant reports participation in everyday
> activities indicating capacities that are transferable to a work setting[.] Even
> where those activities suggest some difficulty functioning, they may be grounds
> for discrediting the claimant's testimony to the extent that they contradict claims
> of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ engaged in the proper two-step analysis. Tr. 28-36. She found that the

objective findings supported some level of functional limitation caused by Plaintiff's mental

health and physical impairments. Tr. 28-32. But, she concluded that Plaintiff's statements

regarding the intensity, persistence, and limiting effects of his symptoms were not consistent with

the medical evidence and other evidence in the record. Tr. 29; *see also* Tr. 36 (concluding that

the record showed a higher level of functioning than Plaintiff alleged in his application and in his

testimony.) In support, she noted his conservative treatment history[2], his activities of daily

_____

[2] Defendant concedes that the ALJ did not sufficiently develop the record regarding
Plaintiff's conservative treatment for his mental health issues and thus, Defendant does not rely

living, his inconsistent reports about his limitations and activities, and because a prior job ended for reasons other than disability.

The ALJ summarized Plaintiff's subjective symptom allegations, including that his conditions affect his abilities to perform many physical functions as well as his abilities to remember and to concentrate. Tr. 28. She noted his allegation that his conditions affect his ability to work because he has a hard time standing and walking, has anxiety and panic attacks, becomes anxious while talking on the phone and in crowds, and has pain. *Id.* She noted that when asked what he could do before the onset of his conditions, Plaintiff responded that he used to be able to walk a lot, play Frisbee golf, and race cars. Tr. 28; *see also* Tr. 197 (Nov. 6, 2013 Adult Function Report). She further noted his complaints of interrupted sleep. *Id.* Next, she recited the limitations he described during his hearing. Tr. 29. The ALJ also summarized his mental health complaints and symptoms. Tr. 30-33

In discussing the medical and psychological evidence, the ALJ noted several times that Plaintiff's reports to his practitioners were inconsistent with his subjective allegations. For example, in 2012, Plaintiff saw his physician for chest pain but reported that he had no pain with exertion or activity, had no shortness of breath, and despite his obesity, he was walking more and playing more disc golf. Tr. 29 (citing Tr. 274). Then again in June 2014, Plaintiff saw his physician for an acute episode of low back pain which occurred while bending over a sink. Tr. 30 (citing Tr. 349, 372-73). At that time, he reported to his physician that he had been walking a lot at disc golf courses and had recently moved a couch. *Id.*(citing Tr. 349, 372-73). He took no medication for the pain, was assessed with lumbago and morbid obesity, and encouraged to

on this reason to support the ALJ's determination. Def. Br. 13, ECF 16.

continue with activity. *Id.* (citing Tr. 349, 372-73); *see also* Tr. 32 (noting that in June 2015, Plaintiff reported in a behavioral health assessment that he took no pain medication) (citing Tr. 408)).

The ALJ also found that Plaintiff's activities of daily living showed he was not as limited as he claimed. Although he claimed in November 2013 that he could no longer play Frisbee golf, the record showed that in February 2016 he told an examining psychologist he tried to play disc golf every other day, Tr. 331, and in April 2016, he reported playing weekly and had been doing so for four years. Tr. 440-41l; *see also* Tr. 33 (noting that despite claim that he could no longer play disc golf, the record showed he continued to play); Tr. 443 (reporting in April 2016 that he lost a large amount of weight by watching his diet and playing disc golf for exercise); Tr. 64 (hearing testimony that he played disc golf weekly with his girlfriend and a friend).

The ALJ remarked that although Plaintiff testified he did not do household chores, the record showed that he vacuumed, washed dishes, cleaned the bathroom, and did laundry. Tr. 33, Tr. 199 (Nov. 2013 Adult Function Report). His mother reported in March 2014 that he cleaned and washed laundry once per week and did not require help or encouragement to do these household chores. Tr. 320. In April 2014, he told an examining physician that he was able to work around the house doing chores such as dishes, laundry, vacuuming, mopping, and sweeping. Tr. 342. And, just before his April 2016 hearing, he told the examining psychologist that while his wife did most of the household cleaning, he engaged in more thorough cleaning every couple of months. Tr. 446. The ALJ specifically found that Plaintiff's allegations of back pain were inconsistent with his ability to drive, cook, perform household chores, walk his dog, shop in stores, use a computer, play disc golf, work on cars, and care for his parents. Tr. 33; *see*

*also id.* (indicating that Plaintiff's report that he could walk only one block before needing to rest was undermined by evidence showing that he walked a lot to play disc golf).

As to his mental impairments, the ALJ noted that despite his alleged social anxiety and impaired attention and concentration, Plaintiff successfully advocated for his daughter to be placed on an individualized education plan (IEP) at school which he admitted was "hard" to do, required him to "push them," and for which he "kept talking to them, kept calling them" and talked to the principal. *See* Tr. 34 (evidence of his ability to help his daughter obtain an IEP undermined restrictive limitations related to mental health diagnoses by psychologist); Tr 51, 60-61. The ALJ explained that despite Plaintiff's complaints related to social anxiety, he shops in stores and does go out alone. Tr. 33 (noting that he overcomes his crippling anxiety to play disc golf, shop in stores, visit his parents, visit his daughter's school, and go to a park) (citing Tr. 199) (Nov. 2013 Adult Function Report); *see also* Tr. 61 (hearing testimony that he goes to daughter's school conferences three to four times per year); Tr. 63-64 (hearing testimony that he visits his parents several times per week and goes places with his father); Tr. 65 (hearing testimony that he goes shopping).

The ALJ also noted that despite Plaintiff's allegations of disabling mental limitations, he managed his family's finances, regularly prepared meals for his family, worked on cars, and used a computer. Tr. 31 (noting allegation that he has problems with concentration and memory); Tr. 33 (reference to using a computer); Tr. 34 (rejecting state agency mental limitation to "1-3 tasks" because of evidence that Plaintiff helps his daughter with homework, uses a computer, manages finances, prepares complete meals, and more); Tr. 36 (giving only partial weight to lay opinion testimony because the record showed that Plaintiff prepares meals daily, manages finances,

follows instructions, gets along with authority figures, and reported an attention span of two hours). The record further indicates that Plaintiff's meal preparation includes cooking full meals for his family that can take sixty to ninety minutes to prepare, Tr. 198, 220, 331, that his management of his family's finances includes keeping track of expenses, paying bills, handling a savings account, and using a checkbook, Tr. 221, 446, that he spends two hours per day using a computer, Tr. 441, and that he knows sign language to use with his mother who is deaf. Tr. 329.

Additionally, the ALJ noted that Plaintiff was able to work previously, but was laid off and thus did not lose his job for reasons related to his impairments. Tr. 33. Cases recognize this as a clear and convincing reason to discount a claimant's subjective testimony. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (upholding negative credibility finding where the claimant stated at the hearing and to at least one doctor that he left his job because he was laid off, not because he was injured).

The ALJ cited specific alleged limitations and provided specific examples of inconsistencies in Plaintiff's testimony, reports to practitioners, and activities of daily living to support her conclusion that Plaintiff's physical and mental impairments, while producing some functional limitations, were not as disabling as Plaintiff alleged. In his own Opening Brief, Plaintiff admits that he played disc golf, performed household chores, and worked on cars. Pl. Op. Br. 15, ECF 15. He argues nonetheless that the activities he engages in do not demonstrate that he has the ability to maintain concentration and attention for an entire day or deal with work stress. *Id.* at 16. But, as *Molina* and other cases make clear, an ALJ, in finding a claimant's testimony not entirely credible, may rely on activities to show a capacity to work, *or*, to contradict claims of a totally debilitating impairment. The ALJ set forth clear and convincing

reasons, supported by substantial evidence in the record, to discredit Plaintiff's subjective testimony because his testimony contradicts his claims of a disabling level of impairment. Plaintiff's arguments are unavailing. The ALJ did not err.

## II. Examining Psychologist Opinion

In April 2016, Plaintiff was examined by Dr. Karla Rae Causeya, Psy. D. Tr. 440-50. Dr. Causeya reviewed Plaintiff's Multnomah County medical records from 2012 through 2014, reviewed his psychological and mental health records from 2014 and 2015, performed a telephone interview with Plaintiff's therapist, conducted a personal interview and mental status examination, and administered the fourth edition of the Wechsler Adult Intelligence Scale (WAIS-IV). Tr. 440. Dr. Causeya diagnosed Plaintiff with autism spectrum disorder, mild intellectual disability, and major depressive disorder, moderate, recurrent. Tr. 449. She completed both a narrative report and a Mental Residual Functional Capacity Assessment (MRFC). Tr. 440-53.

In her narrative report, Dr. Causeya opined that Plaintiff had moderately severe limitations in his (1) activities of daily living; (2) sustained concentration and persistence; (3) maintaining social functioning; (4) adaptation; and (5) episodes of deterioration or decompensation in work-like settings. Tr. 448–49. She also found that he had moderate limitations in understanding and memory. Tr. 448. In a section discussing his prognosis and expected duration, Dr. Causeya stated that Plaintiff was not expected to be able to obtain or maintain gainful employment throughout his lifetime because of his intellectual disability and autism spectrum disorder. Tr. 449.

In the more specific ratings in the MRFC, she found that Plaintiff had moderately severe

limitations in the following abilities: (1) to understand, remember, or carry out detailed (3 or more step) instructions which may or may not be repetitive; (2) to maintain attention and concentration for at least two straight hours with at least four such sessions in a workday; (3) to sustain an ordinary routine without special supervision; (4) to work in coordination with or proximity to others without being distracted; (5) to make simple work-related decisions; (6) to complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a constant pace without an unreasonable number and length of rests; (7) to interact appropriately with the general public or customers; (8) to ask simple questions or request assistance from supervisors; (9) to accept instructions and respond appropriately to criticisms from supervisors; (10) to respond appropriately to expected and unexpected changes in the work setting and routine; (11) to set realistic goals or make plans independently; and (12) to travel in unfamiliar settings and use public transportation. Tr. 451-53.

The ALJ gave Dr. Causeya's opinion "little weight." Tr. 34. "'To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence.'" *Ryan v. Comm'r*, 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)) (brackets in *Ryan*). "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Id.* (quoting *Bayliss*, 427 F.3d at 1216).

The ALJ discussed Dr. Causeya's examination and findings. Tr. 32. She first noted that the findings supported some level of functional limitation. *Id.* But, in later discussing Dr. Causeya's opinions in more detail, the ALJ found that they were not consistent with the evidence

of record.  Tr. 34.  She explained that the moderately severe limitations were "based on a snapshot of the claimant's functioning" and were inconsistent with his "numerous activities of daily living."  *Id.*  She also found that Dr. Causeya based her opinion to a large extent on Plaintiff's subjective report of symptoms.  *Id.*

Plaintiff argues that the ALJ erred in her rejection of Dr. Causeya's opinion because the ALJ failed to acknowledge that the opinion was based on a wide range of information, not just on Plaintiff's subjective reports, the opinion was consistent with the information obtained by Dr. Causeya, the opinion was not based on a "snapshot" as it reflected Dr. Causeya's assessments regarding Plaintiff's sustained abilities, and the ALJ's discussion was conclusory.  Defendant contends that the ALJ did not err.  I agree with Defendant.

First, Plaintiff does not dispute that an ALJ may properly reject an examining practitioner's opinion which is based to a large extent on a claimant's non-credible self-reports. *E.g.*, *Turner v. Comm'r*, 613 F.3d 1217, 1223 (9th Cir. 2010); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999).  Plaintiff also does not challenge that an ALJ may properly reject a medical or psychological opinion that is inconsistent with the claimant's activities.  *Morgan*, 169 F.3d at 600-02 (considering an inconsistency between a treating physician's opinion and a claimant's daily activities a specific and legitimate reason to discount the treating physician's opinion); *Dunn v. Colvin*, No. 6:14-cv-00266-HZ, 2015 WL 505265, at *3 (D. Or. Feb. 3, 2015) ("Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with medical records, inconsistency with a claimant's testimony, and inconsistency with a claimant's daily activities."), *aff'd sub nom. Dunn v. Berryhill*, 722 F. App'x 684 (9th Cir. 2018).

Second, the ALJ described the majority of Dr. Causeya's opinions and then, in the immediately following paragraph, rejected the "numerous moderately severe limits[.]"  Tr. 34. No further specificity regarding what opinions were being rejected was required.  Then, as examples of inconsistencies, the ALJ noted that Plaintiff helped his daughter with homework, advocated getting an IEP in place for her at school, admitted he can pay attention for two hours, can finish tasks, can follow instructions, has no problem getting along with others, and gets along with authority figures.  *Id.*  These specific activities, discussed at other places in the ALJ's opinion as well, undermine the validity of Dr. Causeya's opinions.  The ALJ's discussion, especially when read together with the numerous other places the ALJ's mentions Plaintiff's activities, is not conclusory and provides a specific, legitimate basis for giving little weight to Dr. Causeya's opinion.

Third, Plaintiff is correct that Dr. Causeya relied on several different types of information to form her opinion, some of which was not subjective reports by Plaintiff.  *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (noting that clinical interview and mental status examination are "objective measures").  The only actual test she administered was the WAIS-IV which showed that Plaintiff had an extremely low full scale IQ as well as low scores in verbal comprehension, working memory, and processing speed.  Tr. 447.  In the mental status examination section of her narrative report, Dr. Causeya remarked that Plaintiff showed adequate attention span, effort, and persistence in completing that test.  Tr. 445.

However, in other sections of the mental status examination section of the report, Dr. Causeya noted several "self-reports" Plaintiff made to her.  Tr. 445 (stating that he reported he drove to the appointment, found it difficult to leave home unless accompanied by his wife or

daughter, his overall level of physical activity was minimal, indicated he felt anxious, reported

his mood as tired and nervous, reported difficulty sleeping the previous night, reported being

nervous about finding parking near Dr. Causeya's office).  Thus, while a mental status

examination may be characterized as an objective measure, Dr. Causeya's report suggests she

relied to some degree on Plaintiff's self-reports during that examination.

Additionally, in assessing her autism spectrum disorder diagnosis, the narrative report

indicates that Dr. Causeya relied heavily on Plaintiff's self-reports.  Tr. 443-45.  In that section,

Dr. Causeya cited to the two major symptom areas of autism spectrum disorder from the

*Diagnostic & Statistical Manual of Mental Disorders*, (5th ed. 2013).  *Id.*  Within those two

categories, she included the several individual traits to be assessed.  *Id.*  For example, under the

first symptom area of "Persistent deficits in social communication and social interaction across

multiple contexts, as manifested by the following, currently or by history[,]" she separately

discussed three independent traits.  Tr. 443-44.  In support of each of her findings, she recited

Plaintiff's self-reports.  *Id.*  Thus, in assessing whether he has "deficits in social or emotional

reciprocity (abnormal social approach, failure of normal back and forth conversation, reduced

sharing of interests, emotions, or affect; failure to initiate or respond to social interactions[,])"

Dr. Causeya wrote:

> Nicholas reports a lifelong history of limited social interaction.  He reports that
> with the single friendship he developed at 14 years of age, he never initiated
> interaction with this friend, rather his friend would always drop by unannounced.
> Nicholas reported that he and his wife rarely talk to each other; and live fairly
> separate lives.  She has her friends, but he does not feel comfortable having
> anyone in their home.  He reported that he does not engage in back and forth
> conversations.  He hates talking on the telephone and refuses to answer the
> telephone.

Tr. 443; *see also* Tr. 444-45 (similar cites to "Nicholas reports" in support of additional autism spectrum disorder findings).

The question is whether the ALJ reasonably determined that Dr. Causeya's opinions were based to a large degree on Plaintiff's self-reports when Dr. Causeya also reviewed medical records and relied on some objective measures. All of Dr. Causeya's moderately severe restrictions are attributed in whole or in part to autism spectrum disorder. Tr. 448-49. Given that Dr. Causeya's assessment of this particular disorder appears to be heavily based on Plaintiff's self-reports, I agree with Defendant that the ALJ's conclusion was reasonable. Because Plaintiff's self-reports were not credible, this is a specific and legitimate reason for the ALJ to reject the moderately severe limitations assessed by Dr. Causeya.

In summary on this issue, the ALJ provided specific examples of inconsistent activities which undermined Dr. Causeya's opinions. She also reasonably concluded that Dr. Causeya's opinions were based on a large extent on Plaintiff's self-reports.[3] Thus, the ALJ did not err in giving Dr. Causeya's opinions "little weight."

III. Step Three

At step three, the ALJ considered whether Plaintiff's impairments met or equaled a listed impairment. Of the several discussed by the ALJ, only Listing 12.05 is at issue. Listing 12.05 concerns intellectual disorders and refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before age twenty-two. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2016). In the 2016 version of the regulation in effect

_____

[3] I note that either reason independently supports the ALJ's rejection of the moderately severe limitations assessed by Dr. Causeya.

when the ALJ issued her decision, there were four ways a claimant could meet Listing 12.05 after satisfying the introductory paragraph's diagnostic description. *Jones v. Colvin*, 149 F. Supp. 3d 1251, 1260 (D. Or. 2016) (explaining that the then-introductory paragraph of Listing 12.05 "functions as a substantive requirement") (citing then-Listing 12.00A ("if your impairment satisfies the diagnostic description in the introductory paragraph [of Listing 12.05] and any one of the four sets of criteria, we will find that your impairment meets the listing")); *see also Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013) (including "subaverage intellectual functioning with deficits in adaptive functioning initially manifested before age 22" as one of the requirements a claimant must establish to meet Listing 12.05C).

The ALJ initially concluded that the "threshold test" for Listing 12.05 was not met because Plaintiff does not have adaptive skills limitations with an onset before age twenty-two. Tr. 26.  Next, she found that the criteria for Listings 12.05A, 12.05B, and 12.05D were not met. *Id.* at 24-27.  As to Listing 12.05C, the ALJ found that Plaintiff met the IQ requirement but that the record did not show an onset before age twenty-two or deficits of adaptive functioning.  Tr. 27; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2016) (requiring, in addition to threshold requirement, that claimant show a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]).

In addressing the "threshold test" for establishing any part of Listing 12.05, the ALJ explained:

> No part of the record indicates that the claimant has adaptive-skills limitations. To the contrary, the record shows that his adaptive skills are not deficient.  The claimant stated that on a typical day he makes breakfast, showers, drives, goes to

the store, visits his parents, watches television, and cooks dinner. In addition to caring for himself, he cares for his child, his partner, and a pet dog. He feeds the dog, bathes the dog, takes the dog outside, and plays with the dog. He performs personal care without difficulty. He prepares three meals a day. He vacuums, washes dishes, cleans the bathroom, and launders. He shops in stores for food, clothes and auto parts. He is able to pay bills, count change, handle a savings account, and use a checkbook. In the summertime, he spends two hours a week working on cars.

* * *

The evidence does not establish that the claimant has adaptive skills limitations with an onset before age 22 necessary to show that the claimant meets or equals Listing 12.05. The claimant's ability to care for himself and for his partner, his child, and his dog, in addition to his ability to cook, perform household chores, shop in stores, drive a car, and manage finances supports such a finding. His ability to perform these tasks does not demonstrate deficits in adaptive functioning.

*Id.*

The ALJ also addressed the evidence about Plaintiff's development before age twenty-two. *Id.* She noted that Plaintiff reported to consultative examiner Keli Dean, Psy. D., that he might have repeated kindergarten but he did not know why. *Id.* He described himself as a shy kid. *Id.* He was unsure if he had learning problems in elementary school. *Id.* He reported that he always had problems with his memory, stating that he forgets things quickly after learning them. *Id.* He began having increased problems in school after a sibling's friend burned down the family home. *Id.* He was bullied around this time. *Id.* He began to have difficulty getting out of bed and at times refused to go to school. *Id.* He was transferred to an alternative high school. *Id.* He reported that "it" worked for a little while, but then "it" stopped. *Id.* He received in-home tutoring, but the tutor quit. *Id.* He believes he completed "on and off" about three years of high school. *Id.* He began working through a school program at the age of fifteen, and between ages

fifteen and twenty-one he worked in landscaping, as a cashier, as a parts driver, and as a gas station attendant. *Id.* He last worked as a parts driver but was laid off when the business was sold. *Id.*

Plaintiff argues that the ALJ erred in failing to find that he met Listing 12.05C. Plaintiff notes that he testified at the hearing that he had special education to help him learn to talk, was delayed in speech development, and did not talk until he was four years old. Plaintiff argues that this shows a childhood developmental milestone representative of a deficit in adaptive functioning. He states that he struggled in school and repeated kindergarten, transferred to an alternative high school which did work out, received home tutoring, and did not complete ninth grade. With this evidence, Plaintiff argues that his academic skills show deficits in adaptive functioning compared to other unimpaired individuals.

Plaintiff also challenges the ALJ's finding that he has no adaptive skills limitations because of his activities, including performing his own personal care, preparing meals, performing chores, and paying bills. He seems to assert that some of the evidence about his activities is unreliable because the function report was completed by a state Department of Human Services worker named Cathy Rhodes. Pl. Op. Br. 7.[4] He argues that instead, substantial evidence shows that he has adaptive skills limitations in daily activities because he cleans his

---

[4] Plaintiff offers nothing to support this assertion. Cathy Rhodes worked for the Oregon Department of Human Services State Family Pre-SSI program, which Defendant asserts helps individual pursue federal disability benefits. Def. Br. 8 (citing Tr. 107, 132, 203). She answered all questions in the November 2013 Adult Function Report in the first person, meaning as if she were Plaintiff, acknowledging at the end that she completed the form. Tr. 196-203. The manner in which she completed the form reasonably suggests that she worked with Plaintiff to accurately respond to the questions. Nothing in the form indicates that the information she reported is inaccurate.

home only every couple of months, does not care for his pet or child alone but relies on his disabled partner for assistance, prepares only dinner, and goes to the store during "off hours" with his girlfriend or daughter accompanying him. He argues that the record clearly shows that he had adaptive skills limitations in activities of daily living that continued from childhood to adulthood.

In response, Defendant points to many of the facts previously noted in this Opinion regarding Plaintiff's functional abilities, including his preparation of full meals, performance of household chores, driving a car, handling of family finances, working on cars, caring for his daughter and helping her with homework, caring for his dog, and helping with his parents. Defendant notes that Plaintiff did in fact work for several years until he was twenty-one, performing his last job for more than one and one-half years and losing it to a layoff, not because of performance-related issues. Before that, he worked at a job for four years. According to Defendant, this evidence establishes that Plaintiff fails to show the required deficits in adaptive functioning.

Defendant also notes the inconsistencies in Plaintiff's testimony about his education. He told a social worker in 2012 that he struggled in school but did not receive special education. Tr. 271. In a form related to his disability benefits application, he indicated he was in special education in middle and high school. Tr. 191 (stating in Oct. 2013 Function Report that he was in special education classes from 1992 to 1994). But, he later told a psychologist that he was uncertain if he had ever been in special education. Tr. 441. Plaintiff's hearing testimony, Defendant suggests, was somewhat equivocal because when asked during the hearing if he had been in special education or taken out of mainstream education, he quickly responded "[y]es," but when asked if he knew what that was for, he stated he didn't remember, but thought it was

because he was not talking. Tr. 67. When asked how long it took him to learn how to talk, he stated that he thought he was four years old. Defendant notes that this testimony seems inconsistent with Plaintiff's claim that he was in special education only in later years in middle school and high school. Additionally, it is inconsistent with Plaintiff's 2012 report to the social worker that he reached normal developmental milestones in childhood development. Tr. 271. Plaintiff also reported to one psychologist that his grades were usually Ds and Fs, Tr. 441, but he told another that the only time he had to repeat a grade was, possibly, kindergarten. Tr. 329. And, while he did not complete high school, this was because of anxiety and social issues, not intellectual problems. Tr. 52 (testifying at the hearing that he stopped going to school because of bullying; suggesting also that there were too many people); Tr. 255 (asserting in hearing brief to ALJ that he left school because of anxiety). He also cited anxiety as the reason why he had not pursued a GED. Tr. 271.

The relevant evidence in the record is capable of more than one rational interpretation. It shows that Plaintiff suffers from some functional limitations and allows for an inference that some limitations may have existed before age twenty-two. On the other hand, the evidence is equivocal regarding the degree of limitation before that age. The record has inconsistent reports about Plaintiff's educational history and lacks more reliable records such as school reports or psychological reports issued when Plaintiff was younger than twenty-two. As a result, it is not unreasonable to interpret the evidence such that Plaintiff's failure to complete high school does not, by itself, establish the "threshold test" of showing deficits in adaptive functioning before age twenty-two. Additionally, Plaintiff's work history before age twenty-two shows regular, steady work with no evidence of performance problems and a cessation of work unrelated to his

impairments. And, as Defendant notes, Listing 12.05 addresses limits in intellectual functioning and Plaintiff fails to segregate his various symptoms attributable to his other impairments. While Plaintiff can equal a listed impairment by relying on a combination of impairments, the burden is on the claimant to present a theory of equivalence to the agency or specifically set forth evidence intended to establish equivalence. Plaintiff did not do that before the agency and thus, there is no viable argument now that he has met the listing because of the combined effects of his impairments. *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) ("ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence"); *Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001) (ALJ did not err in concluding that the claimant's conditions did not equal a listed impairment when the claimant offered no theory as to how his two impairments combined to equal a listed impairment nor pointed to evidence showing that the combined impairments equaled a listed impairment).

"Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch*, 400 F.3d at 679; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) ("If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ") (internal quotation marks omitted). The ALJ's interpretation of the evidence regarding Plaintiff's adaptive functioning deficits before age twenty-two was not unreasonable. Plaintiff's alternative reading of the record does not support his contention that the ALJ erred. Accordingly, the ALJ did not err at step three.

/ / /

/ / /

CONCLUSION

The Commissioner's decision to deny SSI benefits to Plaintiff is affirmed.

IT IS SO ORDERED.

Dated this ___14___ day of ___August___, 2018

Marco A. Hernandez
United States District Judge